**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TAMMY S. WILEY,

                                    CASE NO. 16-12524

          *Plaintiff*,             DISTRICT JUDGE MARIANNE O. BATTANI

*v.*                               MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

         *Defendant*.

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS**
**MOTIONS FOR SUMMARY JUDGMENT (Docs. 14, 19)**

**I.**      **RECOMMENDATION**

In light of the entire record in this case, I suggest that substantial evidence does

not support the Commissioner's determination that Wiley is not disabled. Accordingly,

**IT IS RECOMMENDED** that Wiley's Motion for Summary Judgment (Doc. 14) be

**GRANTED**, the Commissioner's Motion (Doc. 19) be **DENIED**, and that this case be

**REMANDED** for further proceedings under Sentence Four of 42 U.S.C. § 405(g).

**II.**      **REPORT**

      **A.**      **Introduction and Procedural History**

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of

Reference, this case was referred to the undersigned magistrate judge for the purpose of

reviewing a final decision by the Commissioner of Social Security ("Commissioner")

denying Plaintiff's claim for Supplemental Security Income ("SSI") under Title XVI, 42

U.S.C. § 1381 *et seq*. (Doc. 3; Tr. 1-4). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 14, 19).

Plaintiff Tammy Sue Wiley was forty-seven years old as of April 7, 2015, the date of the ALJ's decision. (Tr. 26, 148). Her application for benefits was initially denied on April 15, 2013. (Tr. 63). Wiley requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ Regina Sobrino on February 5, 2015. (Tr. 30-56). Wiley, represented by attorney Matthew Taylor, testified, as did vocational expert ("VE") Jacquelyn Shawbecker. (*Id*.). On April 7, 2015, the ALJ issued a written decision in which she found Wiley not disabled. (Tr. 14-26). On June 11, 2016, the Appeals Council denied review. (Tr. 1-4). Wiley filed for judicial review of that final decision on July 6, 2016. (Doc. 1).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

2

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

## C.      Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . .

physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

4

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least 18 years old and has a disability that began before age 22 (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Wiley not disabled under the Act. (Tr. 29). The ALJ found at Step One that Wiley had not engaged in substantial gainful activity following the alleged onset date, July 2, 2013. (Tr. 16). At Step Two, the ALJ concluded that Wiley had the following severe impairments: "diabetes mellitus; obesity; peripheral neuropathy; carpal tunnel syndrome; left ulnar neuropathy; inflammatory arthritis; venous insufficiency; and an affective disorder." (*Id.*). At Step Three, the ALJ found that Wiley's combination of impairments did not meet or equal one of the listed impairments. (Tr. 17-19). The ALJ then found that Wiley had the residual functional capacity ("RFC") to perform sedentary work, except with the following additional limitations:

> [S]he should be able to sit or stand alternatively, provided she is not off task more than 10% of the work period; cannot climb ladders, ropes or scaffolds; cannot kneel, crouch, or crawl; can occasionally climb stairs,

5

balance, and stoop; is limited to frequent handling, fingering, and feeling bilaterally; should not be exposed to hazards such as open, moving machinery or unprotected heights; should not need to use foot or leg controls; should not be exposed to extremes of cold or humidity; is limited to simple, routine, repetitive work not done at a production rate pace (e.g. no assembly-line work), with minimal changes in the work setting; and contact with coworkers, supervisors, and the public should be occasional and routine.

(Tr. 19-24). At Step Four, the ALJ found that Wiley had no past relevant work. (Tr. 24). At Step Five, the ALJ concluded that Wiley retained the ability to perform work which exists in significant numbers in the national economy. (Tr. 25).

### E.    Administrative Record

#### 1.    Medical Evidence

The Court has thoroughly reviewed Wiley's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.    Application Reports and Administrative Hearing

##### a.    Wiley's Function Report

Wiley completed a function report on August 25, 2013. (Tr. 185-97). Wiley wrote that her "hands and feet swell up;" she has hand pain, weakness, and twitching; and severe foot pain which limited her ability to walk. (Tr. 185). Her days consisted of cooking; taking medication; performing personal care; resting with feet elevated; and performing chores like dishwashing, vacuuming, dusting, and cleaning. (Tr. 186). Prior to her illnesses, Wiley was able to take walks with and play with her dog, and stand for long

periods of time. (*Id*.). She woke frequently at night due to the sensation of burning pain. (*Id*.). She had no problems with personal care. (*Id*.). She cooked daily for fifteen to thirty minutes and did laundry once weekly for about two hours. (Tr. 187). She no longer baked, and had difficulty carrying baking dishes, sometimes dropping them. (Tr. 192). She sometimes called on her children for assistance in completing these tasks. (*Id*.). She did not perform outdoor chores due to foot pain and swelling. (Tr. 188).

Wiley left home daily, was able to drive a car, and could go out alone. (Tr. 188). She shopped in stores for groceries once every two weeks, which took ninety to 120 minutes. (*Id*.). She spent free time reading. (*Id*.). Wiley was no longer able to go for recreational walks because of foot pain and swelling, and required frequent breaks if walking. (Tr. 189). She checked boxes indicating that she was limited in terms of walking, standing, lifting, stair climbing, completing tasks, and using her hands. (Tr. 190). She could talk only about "50 steps" without rest, after which she required fifteen minutes of rest. (*Id*.).

### b.    Wiley's Testimony at the First Administrative Hearing

Wiley testified at the February 5, 2015, hearing that she stopped working as a janitor in June 2013 due to "problems standing and walking," and being unable to perform her work. (Tr. 35). She could stand for about fifteen minutes at a time, and could return to standing after a five minute rest. (Tr. 36). When shopping, she would lean on the cart and lift her feet alternately to relieve pressure. (*Id*.). She sometimes found it necessary to sit in the car while her daughter finished the shopping trip. (Tr. 46). Wiley

experienced foot numbness daily; her feet felt numb and changed color. (Tr. 43). Elevating her feet helped to mitigate this issue; she elevated her feet "about nine or [ten] times a day" for about fifteen minutes per instance. (Tr. 44). Pain medication mitigated, but did not resolve, her foot pain. (Tr. 45). Bending at the waist caused Wiley to lose balance. (Tr. 37). Bending at the knees was painful. (*Id.*). Climbing stairs was difficult because her "equilibrium" was "off." (Tr. 38).

Wiley also attested to becoming uncomfortable when sitting for longer than fifteen minutes, which prompted her to shift or move. (Tr. 37). She had difficulty lifting a gallon of milk with one hand; she could lift that weight with two hands, but could not pour the milk. (*Id.*). She had difficulty picking up "little things" because she could not feel her fingers, and thus could not tell when she fully grasped the object. (Tr. 37). She had no difficulty reaching. (*Id.*). She had difficulty picking up small objects, opening lids, carrying small objects, using zippers, and using her touch screen phone. (Tr. 45). She no longer washed silverware because she sometimes cut herself without realizing it. (Tr. 46).

Wiley shopped for groceries with her daughter, but otherwise spent little time outside of the home. (Tr. 38). Wiley enjoyed crocheting, but her hands became quite sore after about ten minutes. (*Id.*). She had trouble getting out of the tub after bathing. (Tr. 39). She could drive, but avoided doing so, because she could not feel her feet on the pedals. (*Id.*).

### c.      The VE's Testimony at the First Administrative Hearing

The ALJ then called upon the services of a VE to determine Wiley's ability to perform work. (Tr. 49). The ALJ asked the VE to assume a hypothetical individual with Wiley's age, education, and work experience, and who could perform light work with the following additional limitations:

> Cannot climb ladders, ropes, or scaffolds; cannot kneel, crouch, or crawl; can occasionally climb stairs, balance, and stoop. Assume a limitation to frequent handling, fingering, and feeling bilaterally. The person should not be exposed to hazards, such as open moving machinery or unprotected heights. The person should not need to use foot or leg controls. There should be no exposure to extremes of cold or humidity. Assume a limitation to simple, routine, repetitive work that is not done at production rate pace. For example, no assembly line work, and there should be minimal changes in the work setting. The work should not require more than occasional, routine contacts with coworkers, supervisors, and the public.

(Tr. 50). The VE responded that Wiley could perform work as a mail routing clerk (30,000 jobs nationally), photo-copy machine operator (70,000 jobs), and inspector (80,000 jobs). (Tr. 51).

The ALJ then inquired whether there would be work for someone similarly limited as in the first hypothetical but who was limited to sedentary rather than light work. (Tr. 51). The VE found that such a worker could perform the positions of document addresser (25,000 jobs) and sorter (25,000 jobs). (Tr. 51-52).

The ALJ then added a further limitation such that the worker could "alternate from sitting to standing, and from standing to sitting for up to five minutes" every fifteen

minutes.[1] (Tr. 52). Applying this restriction to the first (light) hypothetical, the VE found that work as an inspector would remain. (*Id*.). As to the second (sedentary) hypothetical, the VE found that work as an inspector and sorter would remain. (*Id*.).

The ALJ then asked whether a worker who was able to sit or stand at will, but who was not off task for more than ten percent of the workday, would be able to perform work. (Tr. 52). The VE found that the jobs identified in the hypothetical prior would remain. (*Id*.).

Finally, the ALJ asked whether someone limited to standing or walking for less than two hours in the workday would be able to perform the jobs identified in prior hypotheticals. (Tr. 53). The VE agreed that this restriction was compatible with sedentary work. (*Id*.).

### F.     Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an

---

[1] While the ALJ's wording could have been more clear, she appears to suggest that the hypothetical worker would be permitted to sit for ten minutes and stand for five minutes out of every fifteen minute period.

impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic

techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Wiley v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41

12

(E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Wiley v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

   (i)    [D]aily activities;
   (ii)   The location, duration, frequency, and intensity of . . . pain;
   (iii)  Precipitating and aggravating factors;
   (iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
   (v)    Treatment, other than medication, . . . received for relief of . . . pain;
   (vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482

14

U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.    Analysis

Wiley argues that the ALJ erred by 1) Failing to incorporate into the RFC the requirement that Wiley keep her legs elevated for two hours daily, and 2) Failing to account for Wiley's time off task during the workday due to hand pain. (Doc. 14 at 7-16). These arguments will be addressed in turn.

### 1.    The ALJ Adequately Addressed Wiley's Leg Ailments

Wiley first argues that the ALJ erred by discounting an opinion issued by her treating physician, Dr. Rai, who on May 20, 2013, "advised Ms. Wiley that she needed to elevate her feet during the day and to use warm compresses" (Tr. 259) to treat leg pain and swelling. (Doc. 14 at 7). As support for this finding, Wiley notes numerous medical records produced from 2012 to 2014 which suggest that she experienced diminished sensation in her feet and that her feet were discolored. (*Id*. at 11-12).

The Commissioner aptly notes that Dr. Rai's May 2013 statement was not an opinion at all. (Doc. 19 at 14). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments

about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). Dr. Rai's suggestion that Wiley elevate her feet is not a judgment about the nature of her condition or her capabilities, but rather is a suggested course of treatment. The ALJ was thus not obligated to give "good reasons" for discounting this note. She was merely obligated to consider the note in light of the factors set forth in 20 C.F.R. § 404.1527(c), and she complied with that duty.

The Commissioner also correctly notes that Wiley has substantially mischaracterized the nature of Dr. Rai's May 2013 note. Wiley asserts that Dr. Rai advised her to elevate her feet "during the day," whereas the physician in actuality suggested that Wiley elevate her feet "after work." (Tr. 259). Dr. Rai's note is thus inherently compatible with Wiley's ability to perform work.

Wiley also testified that she elevated her legs nine or ten times daily for fifteen minutes per instance, for a total of roughly two hours per day. (Tr. 44). The ALJ was obliged to adopt this self-reported activity only insofar as she found Wiley's leg complaints credible. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186. In this case, the ALJ discounted the credibility of Wiley's leg complaints by referring to her "unremarkable" physical examinations, improvement in her diabetic neuropathy and rheumatism, and reduced pain in September 2014. (Tr. 23). While Wiley's citations to the medical record clearly establish that she suffered from longstanding edema, pain, and neuropathy of the lower extremities, she has not established that these ailments are so

16

severe that she must elevate her legs up to ten times daily for fifteen minutes per instance. Indeed, she has not established the need to elevate her legs during the workday at all. The ALJ therefore did not err by not including this restriction in her RFC finding.

### 2.   The ALJ Did Not Adequately Account for Wiley's Hand Limitations

Wiley next argues that the ALJ erred by insufficiently accounting for her hand ailments. (Doc. 14 at 13-15). Wiley asserts that Drs. Rai and Karrar "opined" that she "would be unable to function with her hands for approximately 25% of the day." (Doc. 14 at 13). She asserts that the ALJ's limitation to being off task no more than ten percent of the workday does not comport with these restrictions. (*Id.*). At the outset, I note that Wiley has misread the ALJ's RFC finding. At the oral hearing, the ALJ asked the VE whether a worker who was able to sit or stand at will, but who was not off task for more than ten percent of the workday, would be able to perform work. (Tr. 52). The ALJ's limitation to being off task for ten percent of the workday is thus clearly intended to account for Wiley's leg symptoms, not her hand symptoms. The ALJ separately accounted for Wiley's hand pain by providing for only "frequent handling, fingering, and feeling bilaterally," which will be discussed further below. (Tr. 19).

On August 29, 2013, Dr. Rai found that Wiley was "still having significant swelling and morning stiffness in both hands limiting functional activities for two to three hours daily now for several months." (Tr. 322). The Commissioner argues that Dr. Rai's finding was "no more than [a] recount[ing] [of] Plaintiff's own subjective complaints."

(Doc. 19 at 20). A physician's findings are not entitled to any deference insofar as they "merely regurgitate[] . . . self-described symptoms," because such a finding does not represent a medical judgment. *Francis v. Comm'r SSA*, 414 Fed App'x 802, 804 (6th Cir. 2011). This does not mean that ALJs are entitled to discount, without further consideration, a claimant's self-reported symptoms or ailments which are not readily demonstrated by physical evidence. However, Dr. Rai did not direct Wiley to using her hands for two to three hours daily, but merely recorded that she did so. Dr. Rai's note was thus not an opinion, and the ALJ was not required to give "good reasons" for discounting it.

Dr. Karrar's findings prove more insightful. Wiley first sought treatment from Dr. Karrar, a rheumatology specialist, on October 23, 2014. (Tr. 384). He recorded that Wiley experienced "aching and stabbing" pain at a rating of six out of ten for two hours each morning. (*Id*.). He also noted that the pain became "worse with activity," and that "[n]o measures seem to relieve the pain." (*Id*.). Dr. Karrar found that Wiley suffered from "Heberden's nodes over the distal interphalangeal joints of the index finger, middle finger, and ring finger." (Tr. 385). Heberden's nodes are hard swelling of the joints of the hands, and are a sign of arthritis. *See Blakiston's Gould Medical Dictionary* 593 (4th ed. 1979) ("Heberden's arthritis: Degenerative joint disease of the terminal joints of the fingers, producing enlargement and flexion deformities. Most common in older women; prominent hereditary pattern."). This finding is fully consistent with Wiley's complaints, and provides objective confirmation of her subjectively reported hand pain.

18

Dr. Karrar's note that activity worsened Wiley's hand pain is particularly important. The ALJ concluded that Wiley's hand pain improved over time, then stabilized. (Tr. 23). The Commissioner likewise points to a June 2013 treatment note wherein Wiley admitted that her hand pain was lessened by activity. (Tr. 253). She also forthrightly stated that her pain was, at that time, "mild" and "generalized." (Tr. 253). The ALJ calls out a September 2014 record wherein Wiley reported improved arm paresthesia, improved arm pain, and a current pain level of two out of ten. (Tr. 22-23, 363). The ALJ's characterization of Wiley's hand pain as improved and stabilized is not supported by the record.

Review of the medical records paints a much different picture. In October 2012 Wiley reported no hand pain or difficulty grasping objects. (Tr. 270). In June and July 2013 Wiley's hands were stiff and swollen, but activity helped to reduce her symptoms. (Tr. 249, 253). In August 2013 Wiley had constant, seven out of ten pain in her hands, along with significant swelling. (Tr. 319, 322). In September 2013 Dr. Nims found that Wiley's grip was unreliable, but she did not have hand swelling. (Tr. 311). In June 2014 Dr. Rai noted worsening hand weakness and pain; Wiley's arthritis was stable, but her carpal tunnel syndrome was worsening. (Tr. 351, 355). Her pain was made worse by activity and repetitive motion, and surgery was discussed as a possibility. (*Id*.). In September 2014 Wiley again reported arm pain. (Tr. 368). In October 2014 Wiley experienced bilateral arm weakness, worsening joint pain rated at six out of ten, morning

stiffness lasting two hours; the pain became worse with activity, and nothing relieved the pain. (Tr. 384).

The longitudinal medical record strongly favors Wiley's claim. First, Wiley's willingness to admit that she had no hand symptoms in 2012 and that activity reduced her symptoms in 2013 suggests that she is a reliable narrator of her hand symptoms. Second, contrary to the ALJ's characterization of the record, Wiley's hand pain, weakness, and numbness generally worsened over time. Perhaps more importantly, use of her hands gradually changed from a pain remedy to a pain precipitator.

As the Commissioner recognizes, the ALJ "did not find that Plaintiff's hand symptomatology would cause her to be off-task for any portion of the workday at all." (Doc. 19 at 23). Neither party addresses in a detailed fashion the hand restriction implemented by the ALJ. Specifically, the ALJ's RFC provided that Wiley was "limited to frequent handling, fingering, and feeling bilaterally." (Tr. 19). Per SSR 83-10, "'Frequent' means occurring from one-third to two-thirds of the time."

The record supports Wiley's claim that she continues to experience significant hand pain which limits her ability to grasp. Recent records suggest that repetitive use of her hands will increase these symptoms. (Tr. 384). This is of special importance given that the ALJ premised her RFC on Wiley's ability to perform sedentary work, a class of jobs which "require good use of the hands and fingers for repetitive hand-finger actions." SSR 83-10. Moreover, the ALJ specified that Wiley would be required to perform "repetitive" work. (Tr. 19). While the RFC limits Wiley to "frequent handling, fingering,

and feeling bilaterally" (Tr. 19), the medical record suggests that Wiley's hand disorders would produce more limitation. The ALJ seemed to recognize this, and attempted to square her RFC with the medical records by discounting the credibility of Wiley's testimony. Yet, as discussed, the medical records thoroughly support Wiley's claims regarding the degree of limitation in her hands.  That Wiley honestly reported intermittent but incomplete and short-lived relief from her upper extremity symptoms is not a good reason to discount her alleged degree of limitation, and instead provides great support to the credibility of her statements. The ALJ's decision is not supported by substantial evidence. This matter should be remanded to the ALJ for further consideration of Wiley's claims in light of a full and fair reading of her hand symptoms.

### H.    Conclusion

For the reasons stated above, the undersigned **RECOMMENDS** that Wiley's Motion for Summary Judgment (Doc. 14) be **GRANTED**, the Commissioner's Motion (Doc. 19) be **DENIED**, and that this case be **REMANDED for further proceedings under Sentence Four of 42 U.S.C. § 405(g)**.

## III.    <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific

objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Wiley v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  May 19, 2017                                  S/ PATRICIA T. MORRIS
                                                     Patricia T. Morris
                                                     United States Magistrate Judge

## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: May 19, 2017                                  By s/Kristen Castaneda
                                                     Case Manager